***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments of the parties. The appealing parties have not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission affirms with modifications the Opinion and Award of Deputy Commissioner Harris and enters the following Opinion and Award. *Page 2 
 ***********
As set forth in the Pre-Trial Agreement and Deputy Commissioner Harris' July 27, 2010 Opinion and Award, the Full Commission addresses the following:
 ISSUES
1. Whether plaintiff remains disabled in this claim?
2. To what further compensation, if any, is plaintiff entitled in this claim?
3. Are defendants entitled to terminate payment of temporary total disability compensation to plaintiff?
 ***********
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Commission has jurisdiction over this matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated, and there is no question as to joinder or non-joinder of parties.
4. Plaintiff alleges to have sustained a compensable injury on November 8, 2007.
5. At the time of the alleged injury, plaintiff's average weekly wage was $568.14, yielding a compensation rate of $378.78.
 *********** EXHIBITS *Page 3 
The following documents were accepted into evidence before Deputy Commissioner Harris as stipulated exhibits:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Industrial Commission Forms and filings
 • Exhibit 3: Plaintiff's medical records (including CompRehab records submitted post-hearing)
 • Exhibit 4: Plaintiff's discovery responses
Transcripts of the depositions of the following were also received into evidence before Deputy Commissioner Harris post-hearing:
 • Dr. Celia L. Spillman
 • Dr. Dennis G. Egnatz (with Defendants' Exhibit A)
 • Dr. William H. Satterfield
 • Dr. Robert V. Sypher, Jr. (with Defendants' Exhibit 1)
 • Dr. John L. Graves (with Defendants' Exhibits 1 2)
 • John F. Warren, III, Ph.D.
 • Jeffrey Feldman, Ph.D. (with Plaintiff's Exhibit 1)
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 42 years old, with a date of birth of February 17, 1968. He is a native of Jamaica and graduated from high school there. He has no formal education beyond high school. While in Jamaica, plaintiff was a *Page 4 
chef in a restaurant for about eight years. He came to the United States in 2000 and did factory work from 2000 to 2008. Plaintiff is right-handed.
2. Plaintiff spoke English at the hearing before the Deputy Commissioner and was able to answer questions and testify without an interpreter.
3. Plaintiff was a "plate wrapper" for defendant-employer in its Winston-Salem plant.
4. On November 8, 2007, plaintiff sustained an injury to his right arm and right shoulder while working in his position with defendant-employer. While he was lifting a heavy battery plate from a pallet, the pallet tilted abruptly, causing plaintiff to have to support more weight and causing a strain to his right biceps and right shoulder.
5. Plaintiff filed a Form 18 in this claim on February 4, 2008, claiming injuries "including, but not necessarily limited to, the right upper extremity and the surrounding muscles, tendons, ligaments, and related tissues."
6. Defendants have never filed a Form 60, Form 61, or Form 63 in this claim. Defendants do not contest that plaintiff was in an accident at work on November 8, 2007. Rather, defendants contest the extent of the compensable consequences of the accident.
7. Prior to the November 8, 2007 incident, plaintiff had no problems with his right arm or right shoulder.
8. After the incident, defendants provided plaintiff with medical treatment. They sent him to Concentra, where he initially saw Richard Trombley, PA, on November 12, 2007. Plaintiff continued to treat with Concentra for a right shoulder injury and right biceps strain.
9. After the incident, plaintiff returned to work with defendant-employer doing light duty one-armed work. *Page 5 
10. While treating with Concentra in November 2007, plaintiff was tender in his anterior shoulder, biceps tendon area, and his posterior shoulder. There were no objective signs of trauma. Dr. Celia L. Spillman, an occupational medicine physician who saw plaintiff at Concentra, stated that plaintiff's subjective presentation was common for someone with a shoulder injury, and she stated that plaintiff's mechanism of injury was consistent with his complaints. Dr. Spillman saw nothing suspicious about plaintiff's presentation.
11. Dr. Spillman restricted plaintiff to no use of his right arm.
12. Plaintiff completed six sessions of physical therapy with Concentra, but his condition did not improve.
13. Plaintiff was last seen at Concentra on December 3, 2007.
14. Defendants stopped plaintiff's treatment with Concentra and sent him to Dr. Dennis G. Egnatz, another occupational medicine physician who was the company doctor.
15. Plaintiff first saw Dr. Egnatz on November 28, 2007. Dr. Egnatz stated that plaintiff was difficult to examine because of his guarding of his right shoulder and arm and that it was difficult to communicate with him.
16. Dr. Egnatz diagnosed a right shoulder strain or sprain. He stated that plaintiff had a definite complaint about his right shoulder that was consistent with a work-related injury.
17. Plaintiff underwent two MRIs of his right shoulder on December 7, 2007, and December 10, 2007. The first MRI showed a subacromial subdeltoid bursal effusion, and the second MRI showed rotator cuff tendonosis and the development of a ganglion cyst. Dr. Egnatz could not say that the MRI findings were traumatic in origin, but he stated that they were consistent with plaintiff's symptoms. *Page 6 
18. Based on his physical examination and plaintiff's complaints, on December 18, 2007, Dr. Egnatz placed plaintiff on restricted duty of sedentary one-handed work. This was the last time that any physician commented on plaintiff's work status.
19. Dr. Egnatz stated that plaintiff's complaints were consistent with his injury history and the radiological findings, but that the level of his pain complaints exceeded what would have been expected. Dr. Egnatz felt that plaintiff's symptoms were markedly exaggerated.
20. Because plaintiff's symptoms were not improving, Dr. Egnatz referred plaintiff for an orthopedic evaluation.
21. Plaintiff presented to Dr. William H. Satterfield, an orthopedist, on December 13, 2007. Again, Dr. Satterfield stated that plaintiff was difficult to examine and that plaintiff's subjective pain limited the objective examination.
22. Dr. Satterfield agreed that the MRI findings, particularly the bursa fluid, may or may not have been traumatic. He had no specific diagnosis for plaintiff's condition, just general right shoulder pain.
23. Dr. Satterfield recommended a corticosteroid injection, which plaintiff initially refused but eventually allowed. Following the injection, plaintiff complained of blurred vision and a skin rash.
24. Dr. Satterfield felt that plaintiff's reported pain level was out of proportion to his right shoulder condition and did not wish to treat him further. He would not have expected plaintiff to be physically limited based on the lack of objective findings.
25. Dr. Satterfield last saw plaintiff on February 21, 2008. As of that time, plaintiff did not exhibit any atrophy in his right arm, which led Dr. Satterfield to conclude that plaintiff must *Page 7 
have been using his right arm and shoulder more than he was presenting at his doctors' appointments.
26. After Dr. Satterfield stopped seeing plaintiff, defendants did not provide any further medical treatment to plaintiff until after the November 20, 2009 hearing before the Deputy Commissioner.
27. Plaintiff stopped working on March 7, 2008, and defendants initiated payment of temporary total disability ("TTD") compensation, which continues to the present.
28. Defendants sent plaintiff for an independent medical examination ("IME") with Dr. Robert V. Sypher, Jr., on July 2, 2008. Dr. Sypher described plaintiff's presentation as "very puzzling" with lots of pain behavior that appeared intentional. Dr. Sypher did not observe any atrophy of plaintiff's right arm or shoulder, and did not see any of the visual objective changes that typically would accompany complex regional pain syndrome. Dr. Sypher felt that his examination of plaintiff was completely compromised by plaintiff's exaggerated pain behavior.
29. Dr. Sypher reviewed the MRIs and saw modest changes suggesting a possible impingement process in plaintiff's right shoulder, but he could not say that such changes were related to the November 8, 2007 incident.
30. Dr. Sypher opined that plaintiff may have had a pain disorder or somatoform disorder that was beyond Dr. Sypher's expertise, or that he may have been malingering. He recommended that plaintiff undergo a comprehensive evaluation at CompRehab at Wake Forest University Baptist Medical Center in order to determine whether plaintiff was suffering from a treatable chronic pain disorder. Defendants did not authorize this referral. *Page 8 
31. Dr. Sypher did not assign any physical restrictions for plaintiff, as he did not see any objective basis to justify any restrictions. He noted that plaintiff had a profound subjective impairment.
32. On March 9, 2009, defendants filed a Form 24 Application seeking to terminate payments of TTD compensation to plaintiff on grounds that "there is no evidence of disability, nor that any alleged continuing symptoms or disablement bear any causal relationship to the workplace accident." Via an Order filed April 28, 2009, Special Deputy Commissioner Jennifer S. Boyer disapproved said application.
33. On March 24, 2009, plaintiff filed a Motion for Authorization of Specific Medical Treatment, seeking to have defendants compelled to provide the evaluation at CompRehab recommended by Dr. Sypher. Via an Order filed April 6, 2009, Special Deputy Commissioner Boyer denied said Motion in the administrative forum.
34. Defendants sent plaintiff for an independent psychological evaluation with Dr. John F. Warren, a clinical psychologist who is also a physician's assistant, on May 22, 2009. Dr. Warren administered a battery of psychological testing and diagnosed malingering and pain disorder with associated psychological features. He could not say whether the pain disorder was related to the November 8, 2007 incident.
35. Dr. Warren felt that Plaintiff was psychologically able to work, but for his self-limitation.
36. Dr. Warren noted that testing showed that plaintiff had an IQ of 73, which is below-average intellect. However, he stated that he had no problem communicating with plaintiff.
37. Dr. Warren did not recommend any further treatment for plaintiff. *Page 9 
38. Defendants sent plaintiff for another IME, with Dr. John L. Graves, on September 8, 2009. Plaintiff complained of continued numbness and tingling down his right arm with burning pain in his right shoulder, and he reported that he had had such pain ever since the date of injury on November 8, 2007.
39. Dr. Graves stated that plaintiff was difficult to examine because of his guarding of his right arm. Dr. Graves read the MRIs to show a partial thickness rotator cuff tear, but nothing in the MRIs would have led him to believe that plaintiff could not move his arm, as he presented. Dr. Graves stated that plaintiff's presentation was outside the realm of believability for a small rotator cuff tear.
40. Dr. Graves did not observe any atrophy of plaintiff's right arm and would not have believed that plaintiff had not used the arm for nearly two years. He was concerned that plaintiff was not being honest about his condition and recommended a functional capacity evaluation ("FCE") in order to try to gauge plaintiff's effort on ability testing.
41. Dr. Graves did not see any basis to assign work restrictions for plaintiff. He would assign a five percent (5%) permanent partial impairment rating for plaintiff's right arm and release him to full duty work, it being Dr. Graves' belief that, once this claim settles, plaintiff will go back to work.
42. Dr. Graves did not believe that plaintiff had a pain syndrome and essentially believed plaintiff was not being honest in order to get ongoing TTD compensation.
43. Plaintiff presented for an FCE on October 26, 2009, and did not complete it, claiming that he was unable to understand the instructions on how to complete the various tasks. The evaluator also noted that there appeared to be a language barrier and that no interpreter was present. *Page 10 
44. Dr. Graves reviewed the FCE results and was not surprised that plaintiff did not complete the test. He stated that he had never seen anyone behave on an FCE like this and described plaintiff's behavior as "fantastical."
45. After the hearing before Deputy Commissioner Harris, and pursuant to his Order, defendants sent plaintiff for treatment at CompRehab. Plaintiff saw Dr. Jeffrey Feldman, a clinical psychologist, for five sessions beginning on November 30, 2009.
46. Dr. Feldman diagnosed plaintiff with chronic pain disorder, which is characterized by a constellation of symptoms including persistent pain, perceived disability, depression, anxiety, and often involvement in the legal process, all of which lead to progressive deconditioning. Dr. Feldman opined that plaintiff's guarding of his right arm had been so extreme and prolonged that it had generated a great deal of pain over time, as well as disbelief from medical providers.
47. Dr. Feldman did not believe that plaintiff's pain behavior was malingering or that such behavior was motivated by secondary gain. He noted that plaintiff complained that he had felt like he was making progress with the initial Concentra treatment but that such treatment was arbitrarily stopped. Plaintiff and his wife appeared genuinely to want plaintiff to get better.
48. Dr. Feldman opined that the November 8, 2007 incident was the external trigger that materially caused plaintiff's chronic pain disorder to develop. However, he could not say that plaintiff's pain disorder had any physical basis, and he did not know what was causing plaintiff's current pain behavior.
49. Dr. Feldman's plan was to coach plaintiff in relaxation techniques and provide cognitive behavioral therapy. The goal was to get plaintiff to relax and move his right arm without hyper-reflexive guarding and reactivity. However, after five sessions, plaintiff was still *Page 11 
unable to do physical therapy and reported that the relaxation techniques had not been helpful, and Dr. Feldman stopped the treatment.
50. Dr. Feldman last saw plaintiff on February 10, 2010.
51. Dr. Feldman recommended a pain management consultation for plaintiff. He felt that this was an option worth trying and that it was in plaintiff's best medical interests.
52. Dr. Feldman opined that Plaintiff did not appear to be able to do anything meaningful physically. He could not imagine plaintiff being able to focus on work or interacting effectively with others because of his perceived pain and disability.
53. After Dr. Feldman's recommendation, defendants tried to secure a pain management evaluation for plaintiff with Advance International Pain Management, but this provider declined to see plaintiff.
54. As of the hearing before the Deputy Commissioner, plaintiff testified that he still had burning pain from his right shoulder down his right arm into his right hand. He testified that he had limited range of motion in his right shoulder and swelling in his right arm. He testified that his pain worsened if he used his right arm.
55. The Full Commission finds by the greater weight of the medical evidence of record that plaintiff does not need any further medical treatment for his right upper extremity injury caused by the November 8, 2007 incident.
56. Plaintiff's first attorney, Mr. Snyder, was allowed to withdraw via an Order filed by the Executive's Secretary's office on June 23, 2009. Mr. Snyder has a fee request pending. Plaintiff's second attorney, Mr. McIver, was allowed to withdraw via an Order filed by Deputy Commissioner Harris on October 12, 2009. Mr. McIver has a fee request pending. Plaintiff's *Page 12 
third attorney, Mr. Welborn, was allowed to withdraw via an Order filed by Deputy Commissioner Harris on March 4, 2010. Mr. Welborn has a fee request pending.
57. Plaintiff was represented at the hearing before the Deputy Commissioner and at the post-hearing depositions by Mr. Smerznak of Mr. Welborn's firm. Prior to the completion of the post-hearing depositions, Mr. Welborn moved to withdraw his firm from representing plaintiff, but the Deputy Commissioner did not allow the withdrawal until after the depositions were completed.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. By the greater weight of the evidence, plaintiff has not carried his burden to show that he remains disabled as a result of the November 8, 2007 accident. Plaintiff may meet his burden of proving disability by producing (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v. Perdue Farms, Inc.,143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. Lowes ProductDistribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993).
2. Plaintiff has failed to prove that he was totally disabled after March 9, 2009. Defendants are entitled to a credit against any future benefits that may be due for overpayment of *Page 13 
temporary total disability paid after March 9, 2009. Plaintiff has failed to prove any further temporary disability related to his compensable injury. Id. N.C. Gen. Stat. § 97-42.
3. Plaintiff has failed to prove that he is entitled to further medical compensation, including pain management, after February 10, 2010. N.C. Gen. Stat. § 97-25.
4. Defendants should be assessed a reasonable sanction for failing to file a Form 60 with the Industrial Commission at least as of the date they commenced paying TTD compensation to plaintiff. A reasonable sanction is a fine of $250.00. N.C. Gen. Stat. § 97-18(j)
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following:
 ORDER
1. Defendants' March 9, 2009 Form 24 application to terminate payment of compensation is ALLOWED. Defendants are entitled to a credit against any future compensation that may be paid to plaintiff, for any overpayment of temporary total disability payments paid to plaintiff after March 9, 2009, through the date of this Opinion and Award.
2. Defendants SHALL pay a fine of $250.00 to the Industrial Commission for their failure to file a Form 60 in this claim.
3. Plaintiff's claim for additional medical treatment for pain management is DENIED.
4. Each side shall bear its own costs.
This the 18th day of February, 2011.
 S/___________________ DANNY LEE MCDONALD *Page 14 
COMMISSIONER
CONCURRING:
 S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ LINDA CHEATHAM COMMISSIONER *Page 1